## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KIM WILT,

        Plaintiff,

   v.

MAHONING TOWNSHIP, T.S.
SCOTT individually, and WILLIAM
LYNN, individually,

        Defendants.

No. 4:17-CV-2030

(Judge Brann)

## MEMORANDUM OPINION

### MAY 11, 2018

## I.     BACKGROUND

On November 3, 2017, Plaintiff, Kim Wilt, hereinafter "Wilt," filed a four-count complaint against Defendants, her employers, Mahoning Township, hereinafter "the Township," T.S. Scott, hereinafter "Scott," and William Lynn, hereinafter "Lynn." Thereafter, on January 16, 2018, Defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for relief. Plaintiff failed to file an opposing brief, pursuant to Middle District Local Rule 7.6. Although I could have deemed the motion unopposed pursuant to that Local Rule, a dismissal of the action without an opportunity to be heard seemed too drastic a sanction for failure to file a brief in opposition. Accordingly, on March 19, 2018, I ordered Plaintiff to file an opposing brief,

which she did.  The motion to dismiss, now ripe for disposition, will be granted, but Plaintiff will be provided leave to amend her complaint, if she is able to do so.

## II.    DISCUSSION

### A.    Motion to Dismiss Standard

When considering a motion to dismiss for failure to state a claim upon which relief may be granted,[1] a court assumes the truth of all factual allegations in a plaintiff's complaint and draws all inferences in favor of that party;[2] the Court does not, however, assume the truth of any of the complaint's legal conclusions.[3]  If a complaint's factual allegations, so treated, state a claim that is plausible – *i.e.*, if they allow the court to infer the Defendant's liability – the motion is denied; if they fail to do so, the motion is granted.[4]

### B.    Facts Alleged in the Complaint

The facts alleged in the amended complaint, which I must accept as true for the purposes of this motion, are as follows.

> 9. Plaintiff, Kim Wilt, is a member of a protected class (sex – female), engaged in protected activity during her employment with Defendants, including filing two complaints with the Pennsylvania Human Relations Commission and the United States Equal Employment Opportunity Commission. Ms. Wilt is a lifelong resident

---

[1]    Federal Rule of Civil Procedure 12(b)(6).

[2]    *Phillips v. Cnty. Of Allegheny*, 616 F.3d 224, 228 (3rd Cir. 2008).

[3]    *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  *See also Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3rd Cir. 2016).

[4]    *Id.*

of the Danville, Pennsylvania area, where she resides with her husband and children.

10. Defendant Mahoning Township (hereinafter "Mahoning Township) is a Pennsylvania municipality with a principal place of business at 849 Bloom Road Danville, Pennsylvania 17821. At all times relevant hereto, Defendant Mahoning Township is engaged in commerce throughout the United States, employs in excess of 15 employees, is an employer pursuant to Title VII of the Civil Rights Act, 42 U.S.C. §2000e et seq. is liable for Plaintiff's damages, and is responsible for the acts of its supervisory employees.

11. Defendant T.S. Scott (hereinafter "Defendant Scott) is an adult male employed as a Supervisor with Mahoning Township and works at 849 Bloom Road Danville, Pennsylvania 17821. At all times relevant hereto, Defendant Scott exercised control over the terms, conditions, and privileges of Ms. Wilt's employment. He is being sued in his individual capacity for First Amendment retaliation against Ms. Wilt as enforced through Section 1983 of the Civil Rights Act, 42 U.S.C. § 1983.

12. Defendant William Lynn (hereinafter "Defendant Lynn) is an adult male employed as a Supervisor with Mahoning Township and works at 849 Bloom Road Danville, Pennsylvania 17821. At all times relevant hereto, Defendant Lynn exercised control over the terms, conditions, and privileges of Ms. Wilt's employment. He is being sued in his individual capacity for First Amendment retaliation against Ms. Wilt as enforced through Section 1983 of the Civil Rights Act, 42 U.S.C. § 1983.

16. After attending a year of college, Ms. Wilt applied for a position with Mahoning Township, which is located in Danville, Pennsylvania, Ms. Wilt's hometown.

17. Ms. Wilt was hired on February 13, 1995 for a Secretary position for the Police Department at a rate of pay of $6.25 per hour.

18. Ms. Wilt was the only female employed with the Township.

19. Over the past twenty-two years, Ms. Wilt has performed successfully in her position with the Township and has never received any negative performance reviews or formal discipline.

20. Over the past twenty-two years, Ms. Wilt has earned raises in pay, and she currently earns $22.27 per hour.

21. Ms. Wilt is a member of a union.

22. Ms. Wilt was the only female employee of the Township until December 31, 2015 when the Township hired a female police officer.

23. Ms. Wilt is the only female employee with the Union, AFSCME.

24. Until January 2017, Ms. Wilt was the lowest paid employee of the Township, despite having worked for the Township for over twenty years.

25. Until January 2017, Ms. Wilt was the lowest paid employee with the Union.

26. Ms. Wilt performs her job duties at the Mahoning Township building located at 849 Bloom Road, Danville, Pennsylvania 17821.
The Mahoning Township Supervisors control the terms, conditions, and privileges of Ms. Wilt's employment.

28. In June 2015, Ms. Wilt engaged in First Amendment protected speech by providing truthful testimony regarding an issue of public safety.

29. Ms. Wilt reported that Mahoning Township police officers had been "huffing" aerosol inhalants on the job at the Mahoning Township building, and were engaged in an illegal wiretap in the workplace.

30. On July 10, 2015, Ms. Wilt filed a complaint and charge of discrimination with the Pennsylvania Human Relations Commission and the United States Equal Employment Opportunity Commission.

31. After providing truthful testimony and reporting a matter of public concern, including to the Montour County District Attorney, Ms. Wilt

was subjected to disparagement by the Township and in the local media.

32. On April 19, 2016, Ms. Wilt filed a second complaint and charge of discrimination with the Pennsylvania Human Relations Commission and the United States Equal Employment Opportunity Commission.

33. In July 2016, the Montour County Common Pleas judge appointed Ken Woodruff, Ms. Wilt's father, to a Township Supervisor position that was vacant.

34. In November 2016, Ms. Wilt and the Township reached a settlement on Ms. Wilt's complaint of sex discrimination filed with the Pennsylvania Human Relations Commission.

35. Given that the Township eventually disciplined and removed the police officers that were engaged in the prohibited activities and having reached a resolution to her complaints including an anti-retaliation provision, Ms. Wilt believed the Township would not retaliate against her or discriminate against her for her activity.

36. On December 16, 2016, Defendant Supervisor Lynn advised the Mahoning Township Supervisors that they would be taking over the Water/Sewer Authority.

37. Defendant Supervisor Lynn stated that the Supervisors are going to be raising the wages of Ms. Wilt and Bret LeVan (male employee of the Water/Sewer Authority) so that they would be equal to the other (male) employees of the Street Department.

38. On January 10, 2017, Defendant Supervisor Lynn brought up the wage increase and told Ms. Wilt that her wages would be increased in February when they took over the Water/Sewer Authority.

39. On January 17, 2017, Defendant Supervisors Lynn and Scott asked Ms. Wilt to come into work on her day off, January 20, 2017, to notarize documents for the Water/Sewer Authority take over.

40. Ms. Wilt agreed to come into work, and Supervisor Lynn again stated that once the Water/Sewer takeover was complete, they would bring Bret LeVan into the union and bring her and his wages up to the current Street Department wages.

41. Ms. Wilt learned that she had been paid significantly less than all the other male employees of the Township for over a decade.

42. The male union employees were earning $4.00 per hour more than Ms. Wilt.

43. This pay disparity results in Ms. Wilt being paid approximately $8,000.00 less the male union employees.

44. Additionally, the pay disparity negatively affects Ms. Wilt's defined benefit retirement plan with the Township, as her retirement is based on her highest wages times years of service.

45. On January 20, 2017, Defendant Supervisor Lynn and Scott asked whether Ms. Wilt would be seeking back pay for the 10 years that she was paid less than the other employees (all of whom were male).

46. Ms. Wilt responded that she should be entitled to receive back pay especially since the Township just awarded two Street Department employees (both male) 10 years on longevity pay.

47. Ms. Wilt requested her salary grade be reviewed and complained that she was not being paid equally to other, male employees.

48. The other, employees with similar job responsibilities as Ms. Wilt, were treated more favorably than Ms. Wilt, and paid a higher grade and hourly rate

49. Ms. Wilt presented the information on the pay disparity to the Township.

50. On January 24, 2017, Ms. Wilt met with Melissa Kelso, the Township's outside counsel.

51. Ms. Wilt specifically told Ms. Kelso that the union members (male) have previously stated that they did not think that a secretary should make as much as a Street Department workers.

52. Ms. Kelso said that it was "silly for them to say that" and advised Ms. Wilt that she should have been brought up to the current Street Department wages in 1995.

53. Ms. Kelso said that if there would be any back pay awarded to Ms, Wilt it would be for the two years prior to the Union coming in and creating the classification.

54. There was no union representative present during Ms. Wilt's meetings with the Township's attorney and supervisors regarding her pay increase.

55. The Township specifically agreed to pay Ms. Wilt two years of back pay and raise her hourly wages to the same as the male union employees.

56. Supervisor Woodruff did not participate in any actions or voting concerning Ms. Wilt's wage complaints.

57. On January 25, 2017, Ms. Wilt's union steward informed her that she was being given a release to sign and return, asking her sarcastically if she "was happy."

58. Ms, Wilt responded that she just want to be treated equally and to have a voice.

59. However, on February 2, 2017, the Township through two supervisors, Defendant Lynn and Defendant Scott, breached the agreement and denied Ms. Wilt's complaint of pay disparity, and refused to correct the discriminatory wages.

60. Furthermore, the Township claimed that Ms. Wilt's job duties were significantly different than other (male) employees who have to work in the "cold, heat, and elements" in "emergent situations."

61. The Township, in a letter signed by Defendant Bill Lynn and Defendant James T.S. Scott, then concluded that "Common sense

supports the differing classifications between office work and outdoor labor."

62. Such a statement is direct evidence of sex discrimination: historically women have been employed in secretarial roles and are stereotypically paid less than the male employees who are paid more because these men brave the elements to provide labor outdoors.

63. As a further point of sex discrimination, after refusing to honor the agreement to pay Ms. Wilt equally and denying Ms. Wilt's complaint of pay disparity, the Township then hired a male, Bret J. LeVan, for a position with the Township and paid him significantly more than Ms. Wilt.

64. The position was not advertised or posted for internal or external candidates.

65. The Township entered into a four-year employment contract with Mr. LeVan beginning on February 6, 2017 and ending on February 5, 2021.

66. In the employment agreement, the Township claims Mr. LeVan is a managerial employee, but he does not supervise two or more full time employees.

67. It is believed that the Township designated Mr. LeVan as a "manager" in bad faith, to circumvent the collective bargaining agreement with AFSCME.

68. The Township agreed to compensate Mr. LeVan at an hourly rate of $24.56 per hour for 2017.

69. The Township agreed to increase Mr. LeVan's hourly rate of compensation each year thereafter, to a $25.75 per hour in 2018, $26.94 per hour in 2019, and $28.13 per hour in 2020.

70. Additionally, despite designating Mr. LeVan as a "manager", the Township agreed to provide Mr. LeVan with overtime pay at one and a half times his normal hourly rate for hours worked in excess of forty (40) each work week.

71. Furthermore, despite designating Mr. LeVan as a "manager," the Township agreed to pay Mr. LeVan on call pay for times he is required to report to the Township outside his normal work hours.

72. For instance, if Mr. LeVan is required to perform work on a Sunday, he is compensated at a rate of two times his hourly rate for a minimum of two hours.

73. The Township further agreed to provide Mr. LeVan with medical insurance and prescription drug coverage, dental insurance, and vision insurance.

74. After Ms. Wilt made a complaint of sex discrimination and pay disparity, Defendant Lynn, Mahoning Township Supervisor, breached the settlement agreement entered into between Ms. Wilt and the Township.

75. On February 13, 2017 Mahoning Township Supervisor Lynn released the terms of the settlement agreement to a reporter, Chris Krepich, with the Press-Enterprise newspaper.

76. On February 14, 2017, the reporter texted Ms. Wilt asking whether she applied elsewhere for employment.

77. He advised, via text to Ms. Wilt, that Defendant Supervisor Scott was talking with him after the Township Meeting and told the reporter of Ms. Wilt's wage issues as well as that she applied for another job.

78. In February 2017, Defendant Supervisor Lynn complained to the newly hired Police Chief that Ms. Wilt was "causing trouble" and complaining to the union.

79. The Police Chief responded to the effect that Ms. Wilt was entitled to engage in union activity as a union member.

80. On March 1, 2017, Defendant Supervisors Lynn and Scott were asked to cease and desist in their hostile environment and behavior directed at Ms. Wilt.

81. The next day, March 2, 2017, Defendant Supervisors Lynn and Scott accused Ms. Wilt and her father (Supervisor Woodruff) of nepotism and made reference to a wage dispute.

82. When asked by members of the public about the wage dispute, Defendant Supervisor Scott stated that he could not provide any further information or he would get in trouble.

83. The Township then hired a part-time secretary and even paid the newly hired, part-time employee more than Ms. Wilt who was with the Township for over twenty years.

84. On March 5, 2017, Defendant Supervisor Scott contacted a township resident and told him that Ms. Wilt's father, Supervisor Woodruff, is "losing it", making a negative reference to his mental state.

85. During a snowstorm on March 14-15, 2017, Ms. Wilt shoveled the steps and sidewalk and around the doors at the Township Building.

86. On March 15, 2017, Defendant Supervisor Scott questioned who shoveled and when Ms. Wilt responded that she did, he cursed, stating "why the hell did you do that…don't think you can add that to your job description."

87. On March 28, 2017, Defendant Supervisor Lynn informed the Press-Enterprise newspaper of Ms. Wilt's Pennsylvania Human Relations Commission settlement with the Township.

88. Defendant Supervisor Lynn told the Press-Enterprise of Ms. Wilt's equal pay claim and said "she already got [disclosed specific monetary amount] what more does she want."

89. Defendant Supervisor Lynn stated this on two separate occasions.

90. The Pennsylvania Human Relations Commission agreement contains a specific clause regarding confidentiality prohibiting the Supervisors, including Defendant Supervisor Lynn, from discussing the settlement with anyone.

91. Defendant Supervisor Lynn also ordered a Mahoning Township patrolman to review the security cameras to surveill [sic]Ms. Wilt during her employment with the Township.

92. The Township continues to refuse to pay Ms. Wilt equally to her male counterparts, despite performing substantially equal jobs with respect to skill, effort and responsibility.

## C.    Count I:  First Amendment Retaliation under 42 U.S.C. § 1983

### 1.    42 U.S.C. § 1983

In order for Wilt to prevail under § 1983 she must establish two elements: first, that the conduct complained of was committed by a person acting under color of state law; and second, that the conduct deprived the Plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States.[5] Defendants do not dispute that the conduct complained of was committed by a person or persons acting under color of state law.  Defendants dispute the second element that establishes a claim under §1983; they argue that Plaintiff was not, in fact, deprived of the rights, privileges or immunities secured by the Constitution or laws of the United States.

### 2.    Right to Freedom of Speech and Right to Petition the Government for Redress of Grievances

The test to determine whether Wilt's Government employer interfered with her Petition Clause rights is the same analysis employed to evaluate claims under

---

[5]  *See Kost v. Kozakiewicz*, 1 F.3d 176, 184 (3d Cir. 1993).

the Speech Clause.[6] The rights are not "identical in their mandate or their purpose and effect to acknowledge that the rights of speech and petition share substantial common ground."[7] "[T]he right to speak and the right to petition are "cognate rights."[8] "Courts should not presume there is always an essential equivalence in the two Clauses or that the Speech Clause precedents necessarily and in every case resolve Petition Clause claims."[9] "There may arise cases where the special concerns of the Petition Clause would provide a sound basis for a distinct analysis..."[10] "[H]owever, claims of retaliation by public employees do not call for this divergence."[11] Consequently, I am satisfied that Wilt's Speech Clause and Petition Clause claims may be considered and analyzed together for the purposes of the instant motion.

"In general, constitutional retaliation claims are analyzed under a three-part test."[12] "Plaintiff must prove (1) that she engaged in constitutionally-protected

---

[6] *Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011).

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Mun. Revenue Servs., Inc. v. McBlain*, 347 Fed. Appx. 817, 823 (3d Cir. Pa. 2009) (internal citations omitted).

activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation."[13]

Retaliation claims began in the public employment context to protect employees from being punished by his or her Government employer for their speech.[14] "A retaliation claim under 42 U.S.C. § 1983 must establish that the government responded to the plaintiff's constitutionally protected activity with conduct or speech that would chill or adversely affect his protected activity."[15]

Here, it is not entirely clear what retaliation Wilt is alleging the Government responded with.   She has not been terminated.  She has not been transferred.  She has, in fact, maintained the same job for the past two decades.   Her wage was negotiated by her union representatives.

In sum, Wilt's complaint is replete with vague, conclusory allegations of retaliation – none of which I may take into consideration in disposing of this motion pursuant to the dictates of *Twombly* and *Iqbal*.   At most, she has alleged that she and her superiors dislike each other.

---

[13]  *Id.*

[14]  *See Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 586 (6th Cir. 2008), *cert. denied*, 128 S. Ct. 2445 (2008), *and see Pickering v. Bd. of Educ. of Twp. High Sch. Dist.* 205, 391 U.S. 563; 88 S. Ct. 1731; 20 L. Ed. 2d 811 (1968) (the seminal case on public employee First Amendment speech rights), *and see Garcetti v. Ceballos*, 547 U.S. 410; 126 S. Ct. 1951; 164 L. Ed. 2d 689 (2006).

[15]  *Balt. Sun Co.*, 437 F.3d at 416, *citing Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005); *ACLU v. Wicomico County*, 999 F.2d 780, 785 (4th Cir. 1993).

It is well established that "the Government, as an employer must have wide discretion and control over the management of its personnel and internal affairs. . . this includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch…prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the workplace, foster disharmony, and ultimately impair the efficiency of an office or agency."[16]  Because Wilt has not alleged any activity tantamount to retaliation, I find that Count I must be dismissed for failure to state a claim.

**D.  Count II: Gender Discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. §2000e *et. seq.* and Count III: Gender Discrimination in violation of the Pennsylvania Human Relations Act, 43 Pa.C.S.A. § 951 *et. seq.*[17]**

Defendants argue that Wilt failed to exhaust her administrative remedies as to her Title VII claim.  In her EEOC filing Wilt alleged only  that she was subjected to increased surveillance; in the complaint she alleges wage discrimination.  Wilt filed her charge of discrimination with the EEOC on May 8, 2017.  The text of her charge on the intake questionnaire reads as follows:

---

[16]  *Connick v. Myers* , 461 U.S. 138, 151 (1983).

[17]  "Claims under the PHRA are interpreted coextensively with Title VII claims." *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 (3d Cir. 2006) *see Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir.1996).

6.  Why do you believe these actions were discriminatory? Please attach additional pages if needed.
I am being discriminated against because I filed a previous complaint that was settled in Mediation with the Pa Human Relations Comm. I believe they are trying to create a hostile work environment to force me to resign.  I am being retaliated against and harassed because they are trying to force my Father to resign as Township Supervisor.

7.  What reason(s) were given to you for the acts you consider discriminatory?  By whom?  His or Her Job Title?
Supervisor Lynn released the contents of my settlement to the Press and stated "Kim already got $xx,xxx, what more does she want?" He did release the money amount which violated the confidentiality clause. Supervisor Lynn went to a Montour Co. Commissioner and told him my father is losing it and we need him to resign and "princess didn't get her way and now they are against us." This was said in a bar room.  I was not given a reason for why he wanted to check the cameras for why my car was there. I do have a text from

18

Title VII requires exhaustion of administrative remedies prior to filing suit in federal court.[19]  It is well-established that "the purpose of requiring an aggrieved party to resort first to the EEOC is twofold: to give notice to the charged party and provide an avenue for voluntary compliance without resort to litigation."[20]  "Courts have allowed claims not specifically mentioned in the EEOC charge where there was a close nexus between the facts supporting the claims raised in the charge and those in the complaint."[21]  Here, Wilt alleges in paragraph 130 of her complaint that she "was subject to disparate treatment because of her sex, including being paid significantly less than her male counterparts in salary and bonus, and being harassed because of her sex as more fully outlined herein."   Because she did not assert that she was being discriminated against based on her wages in the EEOC charge, I conclude that she has not administratively exhausted her wage claim.

---

[18]   ECF No. 7-5 at 2. Although the sentence appears to continue, that is the full copy of the answer to question 7 as docketed by Defendant.

[19]   42 U.S.C. § 2000e–5(e)(1).

[20]   *Glus v. G. C. Murphy Co.*, 562 F.2d 880, 888 (3d Cir. 1977).

[21]   *Tillman v. Pepsi Bottling Grp., Inc.*, 538 F. Supp. 2d 754, 778 (D. Del. 2008), on reconsideration in part, No. CIV.04-1314-SLR, 2008 WL 1987262 (D. Del. May 7, 2008)

There is no 'close nexus' between "increased surveillance," as she charged before the EEOC and lower wages, as she alleges in her complaint. However, she has exhausted her claim of harassment based on sex.

Before I turn to that claim, I will address the lack of exhaustion of her PHRA claim. The PHRA maintains the same requirement as Title VII that a Plaintiff must first proceed administratively. The PHRA's procedural requirements, set forth in Section 959 of that Act, require that:

> Any person claiming to be aggrieved by an alleged unlawful discriminatory practice may make, sign and file with the Commission a verified complaint, in writing, which shall state the name and address of the person, employer, labor organization or employment agency alleged to have committed the unlawful discriminatory practice complained of, and which shall set forth the particulars thereof and contain such other information as may be required by the Commission.[22]

Plaintiff's PHRA claim, therefore, is dismissed as unexhausted because there is no evidence that Plaintiff filed a charge of discrimination with the PHRA.

Finally, I turn to whether Wilt has stated a claim for discrimination based on gender. Defendants argue that Title VII claim should be dismissed because Plaintiff failed to establish a prima facie case of discrimination. However, the United States Court of Appeals for the Third Circuit recently held that Plaintiffs do not need to state a prima facie case of discrimination in order to survive a motion

---

[22]   43 Pa. Stat. Ann. § 959.

for summary judgment.  In *Connelly v. Lane Construction Corp,*[23]  the Third

Circuit provided guidance to district courts on the intersection of a motion to

dismiss[24] and Title VII.[25]  Our Court of Appeals held explicitly that a plaintiff need

not plead a *prima facie* case to survive a motion to dismiss. Judge Kent A. Jordan,

writing for the *Connelly* court explained,

> It is thus worth reiterating that, at least for purposes of pleading
> sufficiency, a complaint need not establish a prima facie case in order
> to survive a motion to dismiss.   A prima facie case is "an evidentiary
> standard, not a pleading requirement," *Swierkiewicz v. Sorema, N.A.,*
> 534 U.S. 506, 510, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), and hence is
> "not a proper measure of whether a complaint fails to state a claim."
> *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir.2009). As we
> have previously noted about pleading in a context such as this,
>
>> [a] determination whether a prima facie case has been
>> made ... is an evidentiary inquiry—it defines the quantum
>> of proof [a] plaintiff must present to create a rebuttable
>> presumption of discrimination. Even post-*Twombly*, it
>> has been noted that a plaintiff is not required to establish
>> the elements of a prima facie case....
>
> *Id.* at 213 (citation omitted). Instead of requiring a prima facie case,
> the post-*Twombly* pleading standard "'simply calls for enough facts to
> raise a reasonable expectation that discovery will reveal evidence of'
> the necessary element[s]." *Phillips v. Cty. of Allegheny*, 515 F.3d 224,
> 234 (3d Cir.2008) (*quoting Twombly*, 550 U.S. at 556, 127 S.Ct.
> 1955).[26]

---

[23]  809 F.3d 780 (3d Cir. 2016).

[24]  Federal Rule of Civil Procedure 12(b)(6).

[25]  42 U.S.C. § 2000e *et. seq.*

[26]  *Connelly,* 809 F.3d at 789.

I now turn to the three step procedure set forth in *Connelly* for evaluating a motion to dismiss.[27]  First, I must recite the elements of the cause of action; next, I identify, but assign no assumption of truth, to conclusions of law plead by the Plaintiff; and, finally, I determine if the facts alleged demonstrate a plausible entitlement to relief.

Title VII provides that "[i]t shall be an unlawful employment practice . . . to discriminate against any individual . . . because of . . . sex."[28]  The elements of gender discrimination are four-fold: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; (4) the adverse employment action occurred under circumstances that give rise to an inference of unlawful discrimination.[29]

Here, Wilt has stated a claim for just one element, namely that she is a member of a protected class.  She has not shown that she has suffered an "adverse employment action," defined as "materially adverse change in the terms and conditions" of employment."[30]  Plaintiff merely alleged that she was subject to increased surveillance.  She has failed to allege any materially adverse change in

---

[27]  *See id.*  at 787.

[28]  42 U.S.C. § 2000e 2(a)(1).

[29]  *See, e.g., Wooler v. Citizens Bank*, 274 Fed. App'x 177, 180 (3d Cir. 2008) (*citing Texas Dep't of Cmty. Affairs v. Burdline*, 450 U.S. 248, 253 (1981)).

[30]  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

the terms and conditions of her employment.  Accordingly, Plaintiff's Title VII claim will be dismissed.

### E.      Count IV: Breach of Contract

In the Commonwealth of Pennsylvania, the elements of a breach of contract claim are clear. "(1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resulting damages."[31]

Wilt signed a settlement agreement with Mahoning Township on November 4, 2016.  The agreement was signed by Wilt, Wilt's father – Ken Wodruff, Bill Lynn, and TS Scott.  The agreement contained a confidentiality clause, which reads, as follows:

> H.      **Confidentiality.**  Wilt understands and agrees that neither she nor her attorneys or other representatives will publicize in any news or communications, media, including, but not limited to, newspapers, magazines, radio and television, the facts or terms and conditions of the settlement.  All parties to this agreement expressly agree to decline comment on any aspect of the settlement to any members of the news media, except to the extent that the municipality may be required by law to disclose such information in the normal course of its governmental duties and activities. [32]

In her complaint, in support of her breach of contract claim, Wilt alleged,

74. After Ms. Wilt made a complaint of sex discrimination and pay disparity, Defendant Lynn, Mahoning Township Supervisor, breached the settlement agreement entered into between Ms. Wilt and the Township.

---

[31]    *Lackner v. Glosser*, 892 A.3d 21, 30 (Pa. Super. Ct. 2006).

[32]    ECF No. 7-3 at 5.

75. On February 13, 2017 Mahoning Township Supervisor Lynn released the terms of the settlement agreement to a reporter, Chris Krepich, with the Press-Enterprise newspaper.

76. On February 14, 2017, the reporter texted Ms. Wilt asking whether she applied elsewhere for employment.

77. He advised, via text to Ms. Wilt, that Defendant Supervisor Scott was talking with him after the Township Meeting and told the reporter of Ms. Wilt's wage issues as well as that she applied for another job.[33]

Defendants argue that confidentiality agreements between an employee and a public entity employer are invalid as a matter of law pursuant to two cases interpreting Pennsylvania's Right to Know law[34] – *Lies v. Mosesso*[35] and *Tribune-Review Pub Co. v. Westmoreland County Housing Authority.*[36] In response, Wilt argues that there was no written request presented to the Township pursuant to the Right to Know Law.

The Pennsylvania Supreme Court has explained that "the question as to whether a municipality must disclose a particular document to the public" has been resolved in favor of the public when the Right to Know Act was codified by the Commonwealth of Pennsylvania's General Assembly in 1957 "by balancing the fundamental public interest in disclosure against the governmental interest in

---

[33]  ECF No. 1.

[34]  65 P.S. §§ 67.101, *et. seq.*

[35]  No. 201310904, 2014 WL 12600518 (Montgomery Co. Ct. Com. Pl., May 19, 2014).

[36]  833 A.2d 112, 120 (Pa. 2003).

confidentiality."[37]  "Section 2 of the Act provides that, "Every public record of an agency shall, at reasonable times, be open for examination and inspection by any citizen of the Commonwealth of Pennsylvania."[38]  "The Act goes on to define a 'public record with reference to receipt and disbursement of public funds, procurement of materials and services, and actions of the agency affecting substantive rights."[39]  "The only records expressly excluded from the Act's definition of 'public record' are only those that come within the purview of the 'investigative records' and the 'statutes, orders and decrees' exclusions.[40]

The Pennsylvania Supreme Court further expounded, "the terms of the settlement of a federal civil rights action, which are based upon acts of the [municipality] and its employees under color of state law, can only fall within the disclosure requirements of the Act as a 'public record.'"[41] "This is so, notwithstanding the confidentiality agreement, inasmuch as the settlement agreement at issue involved conduct of the agency in its official capacity."[42] "Therefore, the agreement that settled the litigation involved the release from liability of a public entity by one of its employees for an act or omission of that

---

[37]  *Id.* at 115.

[38]  *Id.* at 115–16, *citing* 116 65 P.S. § 66.2.

[39]  *Id.* at 116 *citing* 65 P.S. § 66.1(2).

[40]  *Id. citing* 65 P.S. § 66.1(2).

[41]  *Id.* at 116.

[42]  *Id.*

public entity in its official capacity, and is a 'public record' within the meaning of the Act."[43]

It is evident then that the settlement agreement that Wilt signed with the Defendants is a 'public record' subject to disclosure. Plaintiff argues that to be disclosed, the newspaper at issue must have presented a written request to the municipality to obtain the information pursuant to the Right to Know Act. As noted, however, the Pennsylvania Supreme Court has held that as a matter of public policy, confidentiality clauses, in this context, are void and unenforceable. "We hold that…a confidentiality clause contained in that agreement conflicts with public policy and the Right to Know Act and that, where a confidentiality clause subverts public policy, it cannot be enforced."[44]

Because the confidentiality clause here is void, it is unenforceable. Defendants cannot be liable for breach of contract for breaching an unenforceable clause. The motion to dismiss Count IV is therefore granted.

## III.    CONCLUSION

Defendants' Motion to Dismiss pursuant to Rule 12(b )(6) is granted. Although I harbor considerable doubt as to whether Wilt will be able to

---

[43] *Id. citing  Morning Call, Inc. v. Housing Auth. of the City of Allentown,* 769 A.2d 1246 (Pa.Cmwlth.2001).

[44] *Id.* at 121.

satisfactorily amend to state a claim, I am mandated to provide leave to amend. It is timeworn law in this Circuit that leave to amend should be "freely granted."

> "Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir.1997) ( "*Burlington*"); *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1413– 14 (3d Cir.1993). "Futility" means that the complaint, as amended, would fail to state a claim upon which relief could be granted. *Burlington*, 114 F.3d at 1434. In assessing "futility," the District Court applies the same standard of legal sufficiency as applies under Rule 12(b)(6). *Id.*; 3 Moore's Federal Practice, supra § 15.15[3], at 15–47 to –48 (3d ed.2000). Accordingly, if a claim is vulnerable to dismissal under Rule 12(b)(6), but the plaintiff moves to amend, leave to amend generally must be granted unless the amendment would not cure the deficiency.

> The Federal Rules of Civil Procedure do not address the situation in which a deficiency in a complaint could be cured by amendment but leave to amend is not sought. Circuit case law, however, holds that leave to amend must be given in this situation as well. In *Borelli v. City of Reading*, 532 F.2d 950 (3d Cir.1976), this court stated that a district court should use the following procedure in dismissing a complaint for failure to state a claim:

>> [W]e suggest that district judges expressly state, where appropriate, that the plaintiff has leave to amend within a specified period of time, and that application for dismissal of the action may be made if a timely amendment is not forthcoming within that time. If the plaintiff does not desire to amend, he may file an appropriate notice with the district court asserting his intent to stand on the complaint, at which time an order to dismiss the action would be appropriate. Borelli, 532 F.2d at 951 n. 1.[45]

---

[45] *Shane v. Fauver*, 213 F.3d 113, 115–16 (3d Cir. 2000).

As such, Plaintiff will be given fourteen days from today's date to file an amended complaint. If no amended complaint is filed, the action will be summarily dismissed pursuant to Federal Rule of Civil Procedure 41(b).

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge